# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs July 22, 2025

## STATE OF TENNESSEE v. JOHN MARK HALL

**Appeal from the Criminal Court for Knox County**
No. 124152   D. Kelly Thomas, Jr., Senior Judge
_____

**No. E2024-01753-CCA-R3-CD**
_____

The Defendant, John Mark Hall, appeals his Knox County jury conviction of domestic assault, for which he received a sentence of eleven months and twenty-nine days on unsupervised probation after service of 192 hours in jail.  On appeal, the Defendant contends that the State committed prosecutorial misconduct during closing arguments, that the sufficiency and weight of the evidence was lacking, and that the trial court erred by failing to rule on his renewed motion for judgment of acquittal pursuant to Tennessee Rule of Criminal Procedure 29.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

D. David Sexton, II, and Rex J. White, Jr., (on appeal and at motion for new trial hearing); and David Eldridge (at trial), Knoxville, Tennessee, for the appellant, John Mark Hall.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joe Welker and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On March 23, 2023, a Knox County grand jury returned a single-count indictment charging the Defendant with domestic assault related to an altercation occurring in June

2022.  *See* Tenn. Code Ann. § 39-13-111.  The Defendant's trial commenced on January 25, 2024.

Tiffany Sherrill, the victim, testified that she and the Defendant married in May 2021 and lived together in a home in north Knoxville ("the home").  The victim recalled that she first contemplated initiating divorce proceedings as early as two days after her wedding.  She ultimately filed for divorce in April 2022.  The victim described the Defendant as initially reluctant to agree to the divorce; however, the Defendant ultimately conceded, and the entry of a final divorce decree was scheduled for June 22, 2022.  The victim testified she and the Defendant were divorced by the time of the January 2024 trial, but noted they were still awaiting the final division of their marital property.  The victim asked the Defendant to move out of the home during the pendency of the divorce, but the Defendant refused.  Unwilling to continue sharing a bedroom with the Defendant, the victim "moved all of his stuff to the upstairs bedroom."  However, the victim stated that the Defendant would oftentimes sleep in her bedroom unless she insisted upon his sleeping in the upstairs bedroom.

The victim testified she flew from Knoxville to Colorado to visit a friend several days before her assault.  The victim was initially scheduled to return home on the evening of June 12, 2022, but her flight was delayed due to inclement weather.  While she waited to board the plane, the victim received a text message from the Defendant informing her that he would be spending the night at his mother's home.  The victim recalled that the Defendant further said in a text message that she "had messed things up too much for him to agree to a divorce."

The victim finally returned to the home around midnight.  The victim recalled that she was scheduled to work the following morning and that she felt anxious and stressed in anticipation of the coming workday and from "changing time zones."  She stated this anxiety and stress prevented her from falling asleep, so she "had a drink" and played with her dogs.  The victim was unsure exactly what she drank but agreed that she drank alcohol.  At approximately 3:00 a.m. on June 13, 2022, the victim heard a knock at her door.  To her surprise, she found the Defendant attempting to enter the home.  She noted the Defendant "seemed off" and appeared unable to "figure out" how to enter the home, which she viewed as strange because the Defendant had a key to the home.  The victim recalled the Defendant "seemed confused as to where he was going" when he entered the home and appeared "disheveled."

After she admitted the Defendant into the home, the victim questioned the Defendant about his text message stating he no longer agreed to a divorce.  The victim testified that the Defendant walked to the upstairs bedroom and did not "really answer the question," and she followed him upstairs. Upon entering the bedroom, the Defendant

placed his cell phone on the bed, turned around, and exited the bedroom. Believing this behavior "erratic," the victim decided "to figure out what he was upset about." The victim sat facing away from the door on the Defendant's bed and soon noticed a text message on the Defendant's cell phone, which she suspected to be from a woman "he was with that night." Shortly thereafter, the Defendant, who had walked about halfway down the stairs, quickly ascended them again and ran at the victim, "grabbing [her] and throwing [her] to the ground from behind." The victim noted that as she fell, she knocked over a bench that sat near the Defendant's bed, and that the Defendant's cell phone fell from the bed onto the floor. The victim and the Defendant argued as the victim fought to get away from him.

The victim described her memory as "fuzzy" after the Defendant threw her to the ground. However, she remembered that at some point during their altercation, the victim and the Defendant went downstairs, where their argument continued, and the Defendant pushed the victim onto the floor again, removed his belt, and hit her leg with it. The victim noticed what appeared to be a cell phone in the Defendant's front jeans pocket. She saw that the Defendant had retrieved his cell phone from the bedroom floor and held it in his hand as he hit her, so she presumed the Defendant had taken her cell phone. The victim asked the Defendant to return her cell phone and attempted to take it from him. The Defendant refused and instead began recording the victim and accused her of scratching him. The victim conceded it was possible she scratched the Defendant at some point during the altercation. The victim told the Defendant to leave the home, and the Defendant did so and took the victim's cell phone with him.

After the Defendant's departure, the victim returned to her bedroom to retrieve an old cell phone she kept in a dresser drawer. The victim explained she had recently visited an AT&T store and purchased a new SIM card, which she intended to use to change her phone number once her divorce from the Defendant was final so the Defendant could no longer contact her. The victim used this new SIM card to activate her old cell phone and called the cell phone the Defendant had taken from her. The Defendant answered the victim's call and asked her for the cell phone's passcode, which the victim refused to provide. The victim testified that the Defendant later sent her a video showing that he had erased her cell phone's contents and reset it to its factory settings. She recalled that shortly thereafter, the Defendant began sending her crude text messages and accusing her of assaulting him.

The victim called 911, and Officer Jacob Martin from the Knox County Sheriff's Office ("KCSO") was dispatched to the home. The victim testified that she told Officer Martin the Defendant had "shoved [her] down." Officer Martin assured the victim that another detective would contact her shortly after their interview and requested the victim's contact information. The victim recalled that she inadvertently provided the number to the

- 3 -

cell phone the Defendant had taken from her. After waiting "a few days" for a detective to follow up with her, she realized her mistake.

The victim later visited the Knoxville Family Justice Center ("FJC"), where photographs of her injuries were taken. The victim testified she suffered a bruise on her arm, which "looked like a handprint," and a bruise on her leg where the Defendant struck her with his belt. The victim also suspected that a bruise on her left arm was "from falling." While at the FJC, the victim spoke with another detective about the assault. She conceded she "went into greater detail" with this detective than she did with Officer Martin. The victim also recalled feeling afraid to return to the home in the days following the assault; accordingly, she spent a weekend with her parents and approximately a week and a half at a hotel. The victim ultimately returned to the home after she secured an order of protection against the Defendant.

On cross-examination, the victim noted that the stress she felt upon returning home from Colorado was caused partially by the Defendant's text messages indicating he no longer agreed to their upcoming divorce. She explained she was concerned about the "situation" she was in and questioned the Defendant about his text message when he arrived at the home. She maintained that "things got very fuzzy" after the Defendant pushed her onto the floor, but averred that the Defendant did not hit her with his hand, fist, or with the buckle of his belt. She agreed that at some point prior to the assault, she and the Defendant discussed removing the victim from the Defendant's cell phone plan.

A recording made by the Defendant following the altercation was played for the jury. The victim identified herself in the recording and noted that she stood in the kitchen and that the Defendant stood in the adjacent bathroom. In the recording, the Defendant pointed the camera towards a set of scratches on his upper torso and asked, "Look, do you see this?" The Defendant then pointed the camera towards the victim, who responded, "You scratched yourself." The Defendant denied scratching himself, and the victim responded, "Get out of my f****** house."

The victim testified she did not recall scratching the Defendant, but again conceded she may have during the struggle that ensued after the Defendant first "tackled" her. The victim denied that her bruises were caused by the Defendant's attempting to restrain her from assaulting him. The victim also indicated the Defendant later sent her a text message in which he described his scratches as "being caused by keys." She recalled that the Defendant left the home shortly after making the recording.

The victim estimated she called 911 around 5:30 a.m. on June 13, 2022. During the call, the victim informed the police that she had discovered several recording devices inside her home and that the Defendant had left her home and taken her cell phone with him. She

- 4 -

stated she called 911 because she was frightened and "wanted to get help." The victim conceded she did not mention her assault during the call, but noted she told Officer Martin when he arrived that there had been a recent altercation, which "got a little physical." She described this altercation as the Defendant pushing her down because she stood in his way. She explained she was initially afraid to report the assault because she only wanted to "report things that [she] could prove." She recalled that later during the morning of June 13, 2022, she drove to the Defendant's workplace to attempt to retrieve her cell phone, but the Defendant refused to give it to her.

On redirect examination, the victim clarified she told Officer Martin that the Defendant "pushed [her] down with both of his arms." She also noted the scratches depicted in the Defendant's recording were on his "right torso" and "under his arm." She stated that the Defendant's arm must have been raised when he received the injuries.

The State rested. The Defendant made an unsuccessful motion for judgment of acquittal pursuant to Tennessee Rule of Criminal Procedure 29 and elected to present additional proof.

Officer Jacob Martin testified he was dispatched to the home at around 6:00 a.m. on June 13, 2022, in response to the victim's 911 call. Officer Martin recalled the victim initially stated during her 911 call that she had discovered hidden cameras "that had been recording her without her knowledge." He stated the victim did not mention an assault having occurred until he asked whether "anything had gotten physical when [the Defendant] returned to the home." He testified the victim responded that the Defendant had "pushed [her] down" because she was "standing in his way." He noted the victim did not claim the Defendant had either "grabbed or restrained" her or that he struck her with his belt. On cross-examination, Officer Martin stated the victim appeared to have "had a drink" but was not intoxicated. At the conclusion of his interview with the victim, Officer Martin recommended that she visit the FJC because she had alleged having suffered a domestic assault.

The Defendant testified he and the victim first met through an online dating service and that they dated for several years before they lived together. The Defendant stated he did not know the victim wanted to end their relationship until he was served with divorce papers. The Defendant denied that he "ever had second thoughts" about agreeing to the divorce and noted that he was principally concerned with ensuring the marital property was distributed equitably. He testified he communicated these concerns to the victim. He stated that although he "occasionally" slept in the upstairs bedroom during the "last week or so" of their relationship, their sleeping arrangements remained largely unchanged. The Defendant also noted he spent many nights at his family's home in Harrogate, Tennessee, following the initiation of divorce proceedings, including the night of June 12, 2022.

- 5 -

The Defendant testified he informed the victim he would be returning to the home in the early morning hours of June 13, 2022, to change clothes and prepare for work. The Defendant recalled that he arrived at the home at 4:00 a.m. and left at 4:30 a.m. When he arrived, he noticed all the lights in the home were turned on and, upon approaching the front door, he saw the victim standing in the kitchen. The Defendant explained he did not have his key to the home when he arrived, so he knocked on the door for the victim to admit him inside. He recalled seeing several partially empty drinks in the kitchen when he entered the home.

The Defendant stated he did not intend to interact with the victim during his visit because he "didn't have time for it." However, when he entered the home and walked upstairs, the victim became upset about "multiple things, primarily related to the divorce," and, at one point, threatened to "ruin" his career and reputation. The Defendant testified he entered the upstairs bedroom and shut and locked the door behind him in an attempt to ignore the victim. The Defendant recalled that while he sat on the bed and changed his clothes, the victim forced her way into the bedroom. The victim then "jumped on the bed," got behind the Defendant, and squeezed her thighs around his neck. The Defendant stated he was unable to breathe and attempted to remove the victim's legs from his neck, which he thought likely caused the bruising on the victim's leg. The victim then "contort[ed]" the Defendant's body and forced him onto the floor, where the two began "wrestling." The Defendant testified that the victim scratched him during the ensuing struggle and that his wounds were so severe that he was left with scars. The Defendant recalled that he ultimately ended the struggle by grabbing the victim's arms and forcibly pulling her away from him, which he said likely caused the bruising on the victim's arms.

The Defendant testified he broke away from the victim and went to the downstairs bathroom to clean his bloody scratches. He then took photographs of the scratches, which were shown to the jury. The Defendant denied scratching himself and asserted he would not have been able to inflict his wounds upon himself because he was right-handed. The Defendant stated he left the home shortly after taking photographs and videos of his scratches. However, as he drove down the driveway, the victim followed him outside and screamed at him about their divorce. He recalled that the victim threatened that "all hell [would] break loose" if he did not agree to the divorce. He also stated the victim "beat on the car windows, jumped on the hood, [and] chased the car going down the driveway."

The Defendant denied that he pushed the victim off the bed and onto the floor in the upstairs bedroom or that he hit her with his belt. He also stated he and the victim had discussed removing the victim from the Defendant's cell phone plan for several weeks prior to the altercation. He explained he took the victim's cell phone with him when he left the home because the victim had been using two cell phones because he believed that

"if she wanted two phones, she could pay for [them]." The Defendant denied taking the victim's cell phone to prevent her from calling the police.

On cross-examination, the Defendant conceded he did not call the police after the altercation and did not speak to any officers investigating the victim's allegation of domestic assault until his arrest two weeks later. He admitted sending "very inappropriate" text messages to the victim shortly after the altercation in which he stated, "Wanna f***? You need a f***." He agreed this was a "[p]oor choice of words" and asserted he did not recall his motivations in sending the messages. In an attempt to console the victim, he stated he also sent a text message and assured her that he would not hurt her. The Defendant explained that he erased the contents of the victim's cell phone and reset it to its factory settings because he intended to return it to the AT&T store and get a refund.

On redirect examination, the Defendant testified he exercised poor judgment in his text messages with the victim following the altercation. He also conceded he did not mention any of the victim's threats regarding the divorce in any of his filings during those proceedings. He noted he was not represented by counsel during his divorce. He maintained that he did not believe the victim's threats were relevant to the divorce because the proceedings primarily concerned the division of their marital property.

The Defendant rested. Upon this proof, the jury convicted the Defendant as charged. Following a sentencing hearing, the trial court imposed a sentence of eleven months and twenty-nine days on unsupervised probation after serving 192 hours in jail. The Defendant filed a timely but unsuccessful motion for new trial, and this timely appeal followed.

## II.   ANALYSIS

On appeal, the Defendant contends that the State committed prosecutorial misconduct during closing arguments, that the sufficiency and weight of the evidence was lacking, and that the trial court erred by failing to rule on his renewed motion for judgment of acquittal pursuant to Tennessee Rule of Criminal Procedure 29. The State responds that its closing arguments were proper and that the Defendant's latter claim is waived. We agree with the State and will consider these issues in turn.

As a preliminary matter, we note certain deficiencies in the Defendant's brief relative to the issues presented for appellate review. In the context of his argument that the State committed prosecutorial misconduct during closing arguments, he also asserts that he is entitled to a new trial because "witnesses were allowed to refer to the complaining witness as 'victim.'" This issue is separate from a claim of prosecutorial misconduct, but the Defendant's brief does not elaborate further on this argument or provide any statement

of the law to support it. While the Defendant appears to incorporate the substance of this claim into his argument regarding the State's allegedly improper closing arguments, inasmuch as he intends to raise it as a separate issue, it is waived. *See* Tenn. R. App. P. 27(a)(7) (requiring an appellant to present a brief which sets forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."); Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.") Similarly, the Defendant's brief includes a third issue in its statement of the issues presented for review in which he challenges the sufficiency of the evidence and alleges that "new evidence to appellate counsel was discovered." However, beyond a statement of the law regarding the applicable standard of review for a challenge to the sufficiency of the evidence, the Defendant's brief neither argues that the evidence adduced at trial was insufficient to sustain the Defendant's conviction nor indicates what "new evidence" has been discovered.[1] Accordingly, this claim is also waived. Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b); *see also State v. Bonds*, 502 S.W.3d 118, 144 (Tenn. Crim. App. 2016) (holding that this court will "refuse to speculate about which pieces of evidence [an appellant] may find objectionable" where the appellant's brief "fails to specifically identify which evidence he deems improper" and makes only a "general complaint" about the evidence).

## A.    PROSECUTORIAL MISCONDUCT

The Defendant first contends the State committed prosecutorial misconduct during closing arguments. The Defendant concedes he failed to raise his claims of prosecutorial misconduct via contemporaneous objections at trial, but nevertheless requests we review the State's closing arguments for plain error because he raised the issue in his motion for a new trial. The Defendant specifically alleges that the prosecutor, throughout his closing arguments, inappropriately vouched for the veracity of the victim's testimony, referenced matters outside the record which were not matters of public or common knowledge, mischaracterized the proof, and shifted the burden of proof. The State responds that the Defendant is not entitled to plain error relief.

---

[1] Although the Defendant does not specifically indicate what "new evidence" has been discovered that would entitle him to relief, we note that he presented two video recordings, recorded approximately eight months before the incident giving rise to the Defendant's charges in this case, in which the victim struck herself and the Defendant at the hearing on his motion for new trial. The trial court stated that it "certainly wouldn't have found that they were relevant" and noted that it thought "there was a good reason in [trial counsel's] mind that he didn't offer those into evidence 'cause he sure did everything, you know, . . . to discredit her testimony."

As the Defendant correctly notes, his failure to raise his claims of prosecutorial misconduct at trial results in their waiver on appeal. Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case . . . unless the same was specifically stated in a motion for a new trial."); *see also State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010) ("A contemporaneous objection provides the trial court with an opportunity to assess the State's [closing] argument and to caution the prosecution and issue a curative instruction to the jury if necessary."). When a defendant fails to raise a claim of prosecutorial misconduct during closing arguments at trial but presents it as a ground for relief in a motion for a new trial, as in this case, the appropriate standard of review is plain error. *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022); *see also* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

A defendant may only receive relief under plain error review if he or she proves all five of the following prerequisites:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

*State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If a defendant fails to prove any one of the five plain error factors, then he or she is not entitled to plain error relief, and the appellate court is not required to analyze the remaining factors. *State v. Bledsoe*, 226 S.W.3d 349, 358 (Tenn. 2007). In order to qualify as plain error, "[t]he magnitude of the error must have been so significant that it probably changed the outcome of the trial." *Id*. at 354 (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (internal quotation marks omitted)); *see also* Tenn. R. App. P. 36(b).

The Tennessee Supreme Court "has often observed that 'closing argument is a valuable privilege that should not be unduly restricted.'" *State v. Reid*, 164 S.W.3d 286, 320 (Tenn. 2005) (quoting *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001)). Both the defendant and the State have the opportunity "to persuade the jury of their theory of the case and to highlight the strengths and weaknesses in the proof" through closing arguments. *Enix*, 653 S.W.3d at 701 (citing *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). The parties also enjoy the same right to "use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to

be drawn from the evidence . . . or make derogatory remarks or appeal to the jurors' prejudices." *Banks*, 271 S.W.3d at 131 (internal citation omitted). To that end, the parties are usually afforded "the greatest leeway in their manner of expression" during closing arguments. *Id*.

Nevertheless, the trial court must manage the parties during closing argument and may limit the "scope and tenor" of closing arguments to ensure they are "temperate" and "based on the evidence introduced at trial." *Id*. The trial court's decision to restrict closing arguments is discretionary. *Id*. at 132. The State may commit prosecutorial misconduct during closing arguments by

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

*State v. Jones*, 568 S.W.3d 101, 145 (Tenn. 2019) (citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)). Our analysis of whether a challenged portion of the State's closing argument constituted prosecutorial misconduct and prejudiced a defendant's trial is guided by the following factors:

> (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*Banks*, 271 S.W.3d at 131 (first citing *Reid*, 164 S.W.3d at 321, and then citing *State v. Middlebrooks*, 995 S.W.2d 550, 559-60 (Tenn. 1999)). "[P]rosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." *Reid*, 164 S.W.3d at 321 (citing *State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn. 2000)).

The Defendant challenges several of the prosecutor's statements as improper closing argument. During his discussion of the definition and elements of the offense of domestic assault, the prosecutor stated,

So, causing bodily injury. We look at the events that took place on June 13th of 2022. We've got photographs and the testimony to consider.

So[,] I would ask you to consider the location of the bruises that you've seen. *These are consistent with being defensive marks.[2]* They're on the forearm. So[,] it's consistent with having fallen and breaking her fall or blocking an attack. We've also seen bruises and marks in several other places – on her bicep of her other arm and on her calf.

. . . .

Now, I do want to compare and contrast some conflicting testimony and some evidence that you've heard today.

You heard from [the Defendant]. Now, what he is very good at is remaining calm and throwing dig after dig after dig and getting a rise out of the other person while appearing cool, calm, and collected. So[,] when you look at the video submitted by the defense during the cross-examination of [the victim], you can see the [D]efendant. As he's leaving, he shows himself. After he gets a rise out of [the victim], he pushes and pushes and pushes, and *that is quintessential control. That's quintessential abuse. Push, push, push until you get a reaction.* Then you hit the record button and say, "Look what I'm dealing with. I'm the victim here. Look what she did to me. Look how crazy she is."

But do you know who controls when that video is recorded? [The Defendant]. Do you know who controls when that video stops? [The Defendant].

. . . .

Now, he claims that she scratched him. Look at the photographs taken the next day. *Her nails, they're not long. They're not capable of causing wounds like this.*

. . . .

You heard about a report of [the victim] being recorded without her permission. Control. The video from that night shows [the Defendant] calm,

---

[2] We have identified the statements the Defendant specifically challenges in italics.

injured, and her reacting to him. I submit to you that the proof is entirely consistent with him going into the bathroom downstairs, causing those marks, because those marks – there aren't any on his back, and you saw when he demonstrated – he is perfectly able to reach this area right underneath his arm. All of the marks are right here within his reach. Now, he stated that she attacked him from the back, but he's got nothing out of his reach on his back. So[,] I submit to you that the proof is consistent with him being in the bathroom causing that, pushing her to the ground, getting a reaction out of her, and just as he's leaving, snaps the recording as insurance, and then leaves.

[The Defendant] made a couple of other claims that I found strange. So[,] he takes photos of these injuries that he claims that she caused. *He also stated that when he tried to drive away, she had jumped on the hood. Well, if somebody jumps on your hood, even with half their body weight, it's going to cause some kind of mark, some kind of dent on your hood. But there's no photographs of that.*

The first prerequisite for plain error review requires that the record clearly establish what occurred in the trial court. *Rimmer*, 623 S.W.3d at 255. The record in this case includes a transcript of the closing arguments and the statements the Defendant challenges therein, as well as his arguments alleging their impropriety in his motion for new trial. Thus, the first prerequisite for plain error review is satisfied.

The second prerequisite for plain error review requires the Defendant to prove a breach of a clear and unequivocal rule of law. *Id*. First, the Defendant claims the prosecutor inappropriately vouched for the veracity of the victim's testimony by referring to her as a "victim," describing her injuries as "defensive marks," and describing the Defendant's actions as "quintessential control" and "quintessential abuse." Generally, prosecutors are prohibited from "expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant." *Jones*, 568 S.W.3d at 145 (citing *Goltz*, 111 S.W.3d at 6). This practice, often referred to as vouching, involves a prosecutor's insertion of his or her opinion that a witness is telling the truth, such as by stating that the prosecutor "could not personally imagine that [a witness] could lie." *State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012). The prohibition against vouching does not, however, prohibit the prosecutor from "pointing to the specific evidence which tend[s] to undermine" the defendant's testimony or theory of the case, *id*., and the statements the Defendant challenges do just that.

Plainly, the State's theory in this case (as in virtually every prosecution for domestic assault) was that the Defendant committed the crime for which he was charged against the

victim. Adopting the Defendant's argument that a prosecutor crosses the line into misconduct simply by presenting the theory that the victim suffered a crime would functionally prevent the State from arguing even the most basic of its theories of the case. Similarly, the prosecutor's references to the victim's injuries as "defensive" and descriptions of the Defendant's actions as "quintessential control" and "quintessential abuse" were presented in the context of its larger discussion of the proof before the jury. As we have previously noted, the better practice for prosecutors is to preface these discussions with phrases such as "In my view," *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999), "I submit," *State v. Weilacker*, No. M2016-00546-CCA-R3-CD, 2018 WL 5099779, at *6 (Tenn. Crim. App. Oct. 19, 2019), no perm. app. filed, or "I argue," *State v. Spencer,* No. E2022-01276-CCA-R3-CD, 2024 WL 228412, at *12 (Tenn. Crim. App. Jan. 22, 2024), perm. app. denied (Tenn. June 20, 2024). The prohibition against vouching for a witness's credibility is engineered to prevent the State from attempting to influence the jury to convict a defendant based on the prosecutor's personal opinion; it does not, however, prohibit the prosecutor from attempting to persuade the jury by presenting arguments and inferences based on the evidence, as the prosecutor did in this case. Accordingly, we discern no impermissible vouching in the State's closing arguments.

The Defendant challenges these same statements in his argument that the prosecutor inappropriately referenced matters outside the record. Specifically, he contends that the descriptions of the victim's injuries as "defensive marks" and of the Defendant's actions as "quintessential control" amounted to an expert opinion; because the State did not present expert testimony on the characteristics of either bruising or domestic abuse, the Defendant asserts the remarks amounted to prosecutorial misconduct. While a prosecutor is generally prohibited from referring to facts outside the record unless they are matters of common knowledge, he or she may nevertheless comment upon the evidence before the jury and present an argument for the jury to consider "in light of human experience and common sense." *State v. Brown*, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990). In this case, the Defendant argued he acted in self-defense after the victim began assaulting him in the upstairs bedroom. He also argued he suffered scratches from the victim's assault and maintained that the victim's bruises were likely caused by his attempts to restrain the victim from continuing her attacks. The State's theory was that the Defendant was the first aggressor and that the victim attempted to defend herself from the Defendant's attacks. In support of this theory, the State contended that the Defendant pushed the victim to the ground twice during the assault and that she sustained bruises by "breaking her fall or blocking an attack." In sum, the State argued the jury should accredit the victim's testimony, and the Defendant argued the jury should accredit his testimony.

In the context of the facts and circumstances of this case, we cannot conclude that the prosecutor's descriptions of the victim's injuries as "defensive" and of the Defendant's actions as "quintessential control" amounted to a reference to facts outside the proof

- 13 -

requiring expert testimony. The prosecutor's description of the victim's bruises was provided during his summation of the proof and explanation of the elements of domestic assault. The jury reviewed photographs of the victim's bruises and heard her testimony that she was pushed to the floor, that she attempted to defend herself, and that she believed one of her bruises was caused by "falling." Thus, the prosecutor's assertion that the victim's injuries were "consistent with being defensive marks" was simply a comment upon the proof properly before the jury in which the State reiterated its theory of the case. Similarly, the State's description of the Defendant's behavior following the altercation as being indicative of "quintessential control" and "quintessential abuse" was provided in the larger context of an argument intended both to refute the Defendant's theory of self-defense and to encourage the jury to accredit the victim's testimony. Thus, inasmuch as the Defendant posits that these descriptions required expert opinion, which was not provided in the State's proof, we disagree. The prosecutor merely identified the evidence he believed supported the State's theory of the case and suggested certain reasonable inferences the jury could draw from that evidence based on its common sense, knowledge, and experience. The parties are permitted generous leeway to argue their cases and attempt to persuade the jury during closing argument, so long as they do not step outside the metes and bounds of the proof, *id*., which the prosecutor did not do here.

Relatedly, the Defendant argues that the photograph of the bruising on the victim's leg was inconsistent with her trial testimony. The Defendant notes that the victim testified the Defendant struck her on her leg with his belt while standing over her, but the photograph of her bruise showed "a straight line across the inside of her right calf," which the Defendant claims would not have been logistically possible. The Defendant again argues that "[n]o expert testimony was provided by the State regarding the bruising depicted in the photographs submitted to the jury" and presents this argument in the context of his challenge to the State's closing arguments. However, he does not specify how the alleged inconsistencies in the victim's testimony and the photograph of her bruise in any way relate to the prosecutor's closing argument. As the State posits, the tone of this argument is akin to a challenge to the sufficiency of the convicting evidence. Because such a challenge is not properly before this court, the Defendant is not entitled to relief based upon this argument.

The Defendant also contends that the prosecutor intentionally misstated the evidence during closing argument. The Defendant appears to argue that the prosecutor's assertions that the victim's nails were "not long" and "not capable of causing" the Defendant's scratches were direct misstatements of the victim's testimony that it was "possible" that she scratched the Defendant when she tried to "get him off of [her]." However, as the State notes, the prosecutor did not state that the victim did not scratch the Defendant, only that the victim's fingernails were not long enough to cause scratches as severe as those the Defendant alleged he suffered during the attack. Furthermore, the

- 14 -

challenged statement was made in the context of presenting the State's theory of the case and arguing against the credibility of the Defendant's testimony that the victim was the first aggressor and scratched him. This remark was not contradictory to the victim's testimony and was not an improper closing argument.

Finally, the Defendant argues that the State's suggestion that he should have introduced evidence to prove that the victim followed him as he drove away from the home and jumped on the roof of his vehicle shifted the burden of proof. Again, this challenged statement came in the context of pointing out the flaws the State perceived in the Defendant's testimony and his theory of the case. The prosecutor did not argue to the jury that the Defendant, rather than the State, bore the burden of proving his innocence beyond a reasonable doubt; he merely suggested to the jury that the Defendant's testimony was not credible because there was nothing to substantiate his testimony. *See id.* at 130. Furthermore, the issue of whether the victim jumped on the roof of the Defendant's vehicle was in no way intrinsic to the jury's determination of whether the Defendant had committed a domestic assault against the victim in the home. *Cf. State v. Duggan*, No. E2010-00128-CCA-R3-CD, 2011 WL 4910368, at *17 (Tenn. Crim. App. Oct. 17, 2011) (concluding the State's closing arguments "did not shift the burden of proof, but merely recognized the untenable conflicts in the evidence that the jury had to resolve" which did not support the Defendant's theory of the case.), *no perm. app. filed*. Regardless, the trial court instructed the jury that the applicable law is provided by the trial court, that the State bore the burden of proving the Defendant's guilt beyond a reasonable doubt, that the Defendant was "not required to prove his innocence," and that arguments by counsel are not evidence. In addition, the Defendant emphasized the State's burden of proof during his own closing arguments. The jury is presumed to follow the court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006) (citing *Jordan*, 325 S.W.3d at 66). The State's closing argument did not shift the burden of proof to the Defendant.

Having found no misconduct in the prosecutor's closing arguments, we conclude that the Defendant has failed to prove a breach of a clear and unequivocal rule of law. Therefore, we need not consider whether the remaining three prerequisites for plain error review are satisfied. *Bledsoe*, 226 S.W.3d at 358. The Defendant is not entitled to relief on this claim.

### B.     RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

The Defendant also argues that the trial court erred by failing to rule on his renewed motion for judgment of acquittal made at the conclusion of his case-in-chief. In support of this argument, the Defendant posits he was not "afforded the opportunity" "to show the trial court that this case was ripe for dismissal." The State responds that the Defendant has waived appellate review of this issue due to inadequate briefing.

The Defendant's brief includes only three sentences of argument regarding his claim that the trial court erred in failing to rule on his motion for judgment of acquittal. At no point in these three sentences does the Defendant cite any law in support of his assignment of error or specify what relief he seeks from this court. Further, although he cursorily references the record in his discussion of the jury-out hearing in which he presented his renewed motion, he does not do so in the body of his argument on this issue. The Defendant also contends that the trial court "admitted [its] error in not allowing argument when the issue was raised" at the hearing on his motion for new trial, but he again fails to reference the record to substantiate this claim. As noted above, the rules of appellate procedure and of this court require more. Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b); *see also Bonds*, 502 S.W.3d at 144. Simply, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010). Therefore, the Defendant's claim is waived.

## III.   CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the trial court.

s/ *Steven W. Sword*
STEVEN W. SWORD, JUDGE

- 16 -